UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CHRISTOPHER THORNHILL,       )
                              )
        Plaintiff,            )
                              )
    vs.                       )          Case No. 4:12-CV-1150 (CEJ)
                              )
CAROLYN W. COLVIN, Commissioner )
of Social Security,[1]        )
                              )
        Defendant.            )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On March 30, 2009, plaintiff Christopher Thornhill filed applications for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et. seq.*, (Tr. 125-128), and for supplemental security income (SSI), Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an onset date of March 9, 2009. (Tr. 129-132). After plaintiff's application was denied on initial consideration (Tr. 55-61), he requested a hearing from an Administrative Law Judge (ALJ). See Tr. 70-76 (acknowledging request for hearing).

Plaintiff and counsel appeared for a hearing on September 27, 2010. (Tr. 29-49). On the day of the hearing, plaintiff amended his onset date to August 31, 2009. (Tr. 152). On March 18, 2011, the ALJ issued a decision denying plaintiff's application (Tr. 12-28), and the Appeals Council denied plaintiff's request for review on May 14,

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and should be substituted for Michael J. Astrue as the defendant in this suit. No further action need to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

2012. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.[2]

## II. Evidence Before the ALJ

### A. Disability Application Documents

In his Disability Report (Tr. 172-179), plaintiff listed his disabling conditions as bipolar II disorder and hypertension. He stated that he has difficulty concentrating and keeping focus. Plaintiff reported that his medication helps, but it causes him to feel unmotivated. He stated that when he is depressed or fatigued he will sleep a full day. Plaintiff listed past employment as assistant manager at a musical instrument store, file clerk at a law firm, self-employed handyman, inspector at a factory, regional tech at a ticket outlet, retail salesman, retail stock person, and x-ray technician. Plaintiff completed a second Disability Report (Tr. 198-204) adding that he also suffers from mild mood swings and increased isolation.

In his Function Report (Tr. 153-161), plaintiff wrote that his daily activities include getting his son ready for school and sometimes taking him to school, looking for a job, taking care of his daughters, showering, and preparing meals. Plaintiff stated that he is "able to do all indoor and outdoor chores," including shopping for groceries, clothes. and tools. He wrote that he goes outside three to four times a week and that he can drive a motor vehicle. He stated that he can pay bills, handle a savings account, count change, and use a checkbook. He wrote that he used to play music, but no longer does because of a lack of motivation. He further wrote that he gets along with others most of the time, but can have angry outbursts and does not engage in any

---

[2]The plaintiff's brief in support of his complaint was accepted for filing and considered by the Court. Thus, plaintiff's motion to extend the time for filing is moot.

social activities. He stated that he is good at following written and spoken instructions, but does not handle stress or changes in routine very well.

## B. <u>Hearing on September 27, 2010</u>

At the time of the hearing, plaintiff was 43 years old, married, and lived in a house with his wife and three children (then aged 5, 6 and 11). (Tr. 32-33). Plaintiff's height was 6'0" and he weighed 351 pounds. (Tr. 33). Plaintiff completed the 11th grade; he received no further training or education after leaving high school. (Tr. 34). Plaintiff drives three or four miles twice a day transporting his children to and from school.  He testified that he is unable to drive for long periods of time because his medication causes fatigue. (Tr. 33).

Plaintiff testified that he was last employed in August 2009 as a computer technician. (Tr. 34). He stated that he was no longer given assignments due to his inability to focus and complete jobs in a timely manner.  He was self-employed from 2004 to 2008 doing work as a handyman; he stopped because it was hard for him to focus and finish tasks. (Tr. 35). Plaintiff testified that he quit working at the music because of issues involving "focus, confusion, [and] misscommunicati[on]." Plaintiff also quit his job as a computer technician for a ticketing company because of focus issues and difficulties in completing tasks. (Tr. 36).

Plaintiff believed he would be unable to work full time because of his bipolar condition and the fatigue caused by his prescription medication. (Tr. 36-37).  Despite his fatigue, plaintiff stated that he has difficulty sleeping and goes without sleep for two or three nights a month. (Tr. 39-40). He testified that his medication frequently changes and that he has suffered side effects that range from hallucinations to "falling asleep in mid-sentence when [] talking to people." (Tr. 37-38). At the time of the

-3-

hearing, plaintiff stated that he was taking Lamictal,[3] Paxil,[4] and Trazodone.[5] (Tr. 38-39).

Plaintiff testified that he suffers from mood swings in which he is "happy one minute or smiling and then [he] could just fall asleep or [] could tear somebody's head off." He testified that he only interacts with his family and with a couple of friends by telephone. He complained of diabetes, that his legs sometimes swell up to three times their size, and that he is tired and overweight. (Tr. 41). Plaintiff reported difficulty sitting, standing for more than a couple of minutes, and cannot walk a block without a break. (Tr. 41-42). He testified that he has difficulty showering, because he is sometimes too tired to stand, and that the bathtub is too small. (Tr. 42-43).

Plaintiff testified that when he cooks he has problems standing and remembering that there is food on the stove. His wife does most of the cleaning and grocery shopping. (Tr. 43). He testified that he spends most of the day trying to read and play bass, but he loses focus quickly. (Tr. 43-44). Plaintiff testified that he leaves his home only to take his children to school. (Tr. 44).

---

[3] Lamictal, or Lamotrigene, is used to increase the time between episodes of depression, mania, and other abnormal moods in patients with bipolar disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695007.html (last visited on Feb. 15, 2013).

[4] Paxil is a psychotropic drug indicated for the treatment of major depressive disorder, obsessive-compulsive disorder, panic disorder, social anxiety disorder, generalized anxiety disorder, and post-traumatic stress disorder. See Phys. Desk. Ref. 1501-03 (60th ed. 2006).

[5] Trazodone is a seratonin modulator prescribed for the treatment of depression. It may also be prescribed for the treatment of schizophrenia and anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html (last visited on Feb. 15, 2013).

Plaintiff testified to having a case manager who helps him with day-to day matters, such as taking him to appointments and helping him with paperwork and medication. (Tr. 44-45).

He stated that he smokes about two packs of cigarettes a day because of his nerves. (Tr. 45). He admitted to smoking marijuana, but testified that his last use was one year prior to the hearing. (Tr. 45-46).

In response to questions posed by the ALJ, plaintiff testified that he was denied Medicaid because he missed an appointment, that he has seen his psychiatrist every four weeks since 2004, and that his family lives solely on food stamps and his wife's part-time income. (Tr. 46-47).

### C. Opinion of Vocational Expert

On October 18, 2010, the ALJ sent a letter to vocational expert, James M. England, Jr., M.Ed., requesting that he complete a set of interrogatories based on his professional opinion of plaintiff's current employment opportunities. (Tr. 208-214).

After confirming that he had read and understood the medical reports and familiarized himself with the exhibits in the case, Mr. England listed plaintiff's vocational history for the past fifteen years and classified each position. Mr. England described handyman as medium, skilled work; assistant manager at a musical instrument store as medium work based on the way plaintiff performed the job, but light work based on the way it is normally performed in the open labor market; retail sales and file clerk as light, semi-skilled work; and ticket machine technician as medium, semi-skilled work. (Tr. 219-220).

The interrogatories asked about the employment opportunities for a hypothetical 43-year-old individual with a high school equivalent education and a work history as

described in the records of the instant case. Mr. England was asked to assume that the individual's combined impairments limited him to medium work, except for lifting or carrying more than 50 pounds occasionally and 25 pounds frequently; standing or walking more than 6 hours in an 8-hour workday; exposure to hazards (unprotected heights or dangerous unprotected moving machinery); and performing more than simple work with no more than occasional interaction with the general public. Mr. England answered that such an individual would not be able to perform any of plaintiff's past work since those jobs required more than simple work activity and some of the jobs involved more than occasional interaction with the general public. Mr. England further stated that the hypothetical individual would have no usable transferable skills because of the restrictions involving moving machinery and occasional interaction with the general public. (Tr. 217-218, 220).

Mr. England was then asked to identify the jobs that the hypothetical individual with the same limitations could perform. Mr. England opined that such an individual could perform work as a busboy, a medium position with a Specific Vocational Preparation ("SVP") level of 2[6] (of which there are 1,500 in the St. Louis metropolitan area); dishwasher, a medium position with an SVP of 2 (of which there are 3,000 in the St. Louis metropolitan area); office cleaner, a light, unskilled position (of which there are 12,000 in the St. Louis metropolitan area); and assembler of small parts, a

---

[6] The SVP level listed for each occupation in the Dictionary of Occupational Titles (DOT) connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. Hulsey v. Astrue, 622 F.3d 917, 923 (8th Cir. 2010). At SVP level 2, an occupation requires more than a short demonstration but not more than one month of vocational preparation. 20 C.F.R. § 656.3.

light position with an SVP of 2 (of which there are 3,000 in the St. Louis metropolitan area). (Tr. 220).

On February 9, 2011, Mr. England responded to additional hypothetical questions posed by plaintiff's counsel. (Tr. 221-223, 229). The first question asked about the employment opportunities for an individual with the same age, education and past relevant work as plaintiff who has marked[7] limitations in his abilities to maintain reliability; make simple and rational decisions; and maintain attention and concentration for extended periods. Additionally, this individual also has moderate[8] limitations in his abilities to cope with normal work stress; function independently; behave in an emotionally stable manner; adhere to basic standards of neatness and cleanliness; relate to family, peers or caregivers; interact with strangers or the general public; accept instructions and respond to criticism; perform at a consistent pace without an unreasonable number and length of breaks; sustain an ordinary routine without special supervision; and respond to changes in a work setting. Mr. England answered that he did not believe that such an individual would be able to perform any of plaintiff's past relevant work or any alternative work in the local or national economy.

The second question asked about the employment opportunities for an individual with the same age, education and past relevant work as plaintiff who, because of

---

[7] Plaintiff's attorney defines "marked" as "a limitation that seriously interferes with the ability to function independently, appropriately and effectively. This level of limitation is incompatible with the ability to perform the function eight hours a day, five days a week or a compatible schedule."

[8] Plaintiff's attorney defines "moderate" as "a significant limitation, but the individual retains the ability to perform the activity satisfactorily approximately 2/3 of the time.").

-7-

psychologically based symptoms, would miss work three or more times a month and would be late to work or need to leave work early three or more times a month. Mr. England answered that he did not believe that such an individual would be able to perform any of plaintiff's past relevant work or any alternative work in the local or national economy.

The third question asked about the employment opportunities for an individual with the same age, education and past relevant work as plaintiff who only retained the abilities to apply common-sense understanding to carry out simple one or two step instructions for a total of 6 hours during an 8-hour day and interact appropriately with coworkers, supervisors, and the general public for a total of 6 hours in an 8-hour day. Mr. England answered that he did not believe that such an individual would be able to sustain work in the long run, either in plaintiff's past employment or in alternative employment.

### D.  Medical Evidence

The medical records reflect that plaintiff has been seeing Eileen Wu, M.D. at BJC Behavioral Health for bipolar II disorder, marijuana abuse, and a history of alcohol and cocaine abuse since 2004.

On January 13, 2009, Dr. Wu decreased plaintiff's Paxil[9] from 30 mg to 20 mg. No change was made to the Wellbutrin.[10] (Tr. 265). On February 10, 2009, Dr. Wu

---

[9]  Paxil is a psychotropic drug indicated for the treatment of major depressive disorder, obsessive-compulsive disorder, panic disorder, social anxiety disorder, generalized anxiety disorder, and post-traumatic stress disorder.  See Phys. Desk. Ref. 1501-03 (60th ed. 2006).

[10] Wellbutrin, or Buproprion, is an antidepressant of the aminoketone class and is indicated for treatment of major depressive disorder.  See Phys. Desk Ref. 1648-49 (63rd ed. 2009).

noted that "things [were] going well" and that plaintiff was not suffering from any depression, financial stress, or sleep deprivation." (Tr. 265). On May 4, 2009, Dr. Wu wrote that plaintiff's energy is okay if he gets enough sleep, but that he stays up late to watch television. (Tr. 263). On June 2, 2009, Dr. Wu wrote that plaintiff has a bad temperament, but is cooperative. Plaintiff complained that there was "no work out there," that he was struggling with financial debt, was stressed, and had trouble sleeping. Dr. Wu increased plaintiff's Paxil to 30 mg. (Tr. 302).

On July 8, 2009, Kyle Devore, Ph.D., completed a Psychiatric Review Technique form. Dr. Devore reported that he had insufficient evidence to determine plaintiff's medical disposition or functional limitations because plaintiff failed to keep the appointment for the scheduled examination. (Tr. 271-281).

On August 3, 2009, Dr. Wu noted that plaintiff discontinued his Wellbutrin a few weeks earlier without physician direction. Plaintiff reported that his financial situation was better, his sleep deprivation was improving, and that he had increased energy and motivation. Dr. Wu observed that plaintiff was more animated and discontinued the Wellbutrin prescription. (Tr. 299).

On August 20, 2009, Dr. Wu completed an Annual Assessment and Treatment Plan. The report stated that plaintiff "recently experienced improvement with his mood and level of motivation since he [] increased his work" and that he is "vulnerable to depression when he has financial difficulty and is unable to provide for his family." Plaintiff was advised to discontinue his marijuana use and to follow up with a doctor for his obesity and other medical issues, which he consistently fails to do. Plaintiff reported that he is very active with his children's daily activities, school and schedules. Dr. Wu recommended conservative treatment described as "low intensity community

based services," which includes medication, psycho-education, physical health services, case management services, and exercise with a healthy lifestyle. Plaintiff was diagnosed with bipolar II disorder, depression, marijuana abuse, history of alcohol and cocaine abuse, cluster B personality disorder, hypertension, obesity. He was assigned a GAF score of 55-60.[11] (Tr. 288-289).

On September 7, 2009, Dr. Wu wrote that plaintiff's mood was depressed, that he could not find work, and that he was having financial difficulties. (Tr. 266). On December 7, 2009, Dr. Wu wrote that plaintiff typically sleeps six hours per night and that he drinks a half a pot of coffee per day. Dr. Wu described plaintiff as largely goal-oriented with a depressed mood. Plaintiff's medications were not adjusted. (Tr. 296). On February 23, 2010, plaintiff reported to Dr. Wu that he was sleeping poorly, drinking coffee excessively, and that he has no energy and was not working. He further reported smoking a pack of cigarettes a day and daily use of marijuana. (Tr. 295).

On March 26, 2010, plaintiff saw Walter J. Griffin, M.D. at the South County Health Center for a physical exam. Plaintiff reported that he was working full-time doing electrical work and going to school. Plaintiff stated that he had a GED. Treatment notes indicate that plaintiff suffered from muscle pain, but no joint pain or muscle weakness. He was described as alert, cooperative, and obese with a normal gait. He was found to have no lesions, fractures, or deformities. Plaintiff was diagnosed with

---

[11]A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (E.g., few friends, conflicts with peers or co-workers)."  American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

hypertension. He was prescribed Amlodipine Besylate[12] and given dietary advice. (Tr. 317-319).

On March 30, 2010, plaintiff visited with Shilpa Thornton, M.D. at the South County Health Center because he "saw something in [his] right eye." Dr. Thornton diagnosed plaintiff with diabetes mellitus, hypertensive retinopathy, and preglaucoma. Plaintiff was referred to St. Louis ConnectCare Ophthalmology. (Tr. 315-316). The following day, plaintiff saw Caroline Van Marello, M.S., R.D., L.D. at the South County Health Center in order to discuss nutrition and diet. Plaintiff was advised to eat more fiber and vegetables, drink less juice, and keep a food diary. (Tr. 313-314).

On April 7, 2010, Dr. Wu completed a medical source statement. Dr. Wu indicated that plaintiff had moderate limitations[13] in the following areas: coping with normal stress; functioning independently; behaving in an emotionally stable manner; adhering to basic standards of neatness and cleanliness; relating to family, peers or caregivers; interacting with strangers or the general public; accepting instructions or responding to criticism; performing at a consistent pace without an unreasonable number and length of breaks; sustaining an ordinary routine without special supervision; and responding to changes in a work setting. Dr. Wu wrote that plaintiff had marked limitations[14] in maintaining reliability; making simple and rational

_____

[12] Amlodipine is indicated for the treatment of hypertension by inhibiting the transmembrane influx of calcium ions into vascular smooth muscle and cardiac muscle. http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=10166 (last visited Feb. 27, 2013).

[13] "Moderate" is defined as a "limitation that is significant and more than minimal, but the individual retains the ability to perform the activity satisfactorily approximately 2/3 of the time."

[14] "Marked" is defined as a "limitation that seriously interferes with the ability to perform the activity independently, appropriately, and effectively - more than moderate, but less than extreme - substantial loss of the ability to function effectively

-11-

decisions; and maintaining attention and concentration for extended periods. Dr. Wu indicated that plaintiff had no limitations in asking simple questions or requesting assistance and maintaining socially acceptable behavior. Dr. Wu found that plaintiff did not have any extreme limitations.[15] Dr. Wu indicated that plaintiff could apply common-sense understanding to carry out simple one or two-step instructions and interact appropriately with co-workers, supervisors, and the general public for 6 hours out of an 8-hour work day. Dr. Wu believed that plaintiff would be absent and late three times a month or more. Dr. Wu wrote that plaintiff's disability began on December 2009. The diagnosis consisted of bipolar affective disorder type II, marijuana abuse, history of alcohol and cocaine abuse, cluster B personality disorder, obesity, hypertension, and a GAF of 55. (Tr. 283-286).

On April 9, 2010, plaintiff saw Nancy Keller, M.S., R.D., L.D. at the South County Health Center for a weight-loss follow up. Treatment notes indicate that plaintiff was "in [a] contemplation stage and not yet ready for action." He was given recipe ideas and information on portion control. (Tr. 312). On April 16, 2010, plaintiff saw Dr. Griffin for a general follow-up. Plaintiff was described as alert, cooperative, and obese with a normal gait. Treatment notes indicate edema of the feet and swelling of extremities. Plaintiff's diagnosis was listed as diabetes mellitus without mention of complication and hypertension. Dr. Griffin prescribed potassium chloride.[16] (Tr. 309-311).

---

in this area.

[15] "Extreme" is defined as a "limitation that totally precludes the individual's ability to usefully perform the activity or to sustain performance of the activity."

[16] Potassium Chloride is used to prevent or treat hypokalemia (low blood levels of potassium). http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=33224 (last visited Feb. 28, 2013).

On April 21, 2010, plaintiff reported to Dr. Wu that he had completely changed his diet after meeting with his dietitian, that he was taking his medications, and that he had decreased his marijuana use. Plaintiff stated that he did not have any medication side effects and was getting six to seven hours of sleep per night. He reported experiencing financial stress and a feeling of hopelessness; he was not working. Plaintiff also reported to Dr. Wu that he had taken on "full time responsibilities with taking care of his three children during most days of the week and therefore has not been able to pursue the computer jobs with his friend. He has also had difficulty finding time to work from home as he is taking the children back and forth to school and functions and has one young child at home during the day." (Tr. 291-292).

Dr. Wu described him as having a fair general appearance, a cooperative demeanor, alert and euthymic. Her diagnoses were bipolar affective disorder type II, depression; marijuana dependence in partial remission; history of alcohol, cocaine abuse; and cluster B personality disorder. Dr. Wu increased plaintiff's Lamictal prescription to 25mg and instructed him to take two tablets every night at bedtime. (Tr. 291-293).

On April 21, 2010, Dr. Wu wrote that plaintiff "has taken on full time responsibilities with taking care of his three children during most days of the week and therefore has not been able to pursue [work]." Dr. Wu further wrote that plaintiff also has "difficulty finding time to work from home" because of his responsibilities to his children. (Tr. 290).

On May 17, 2010, plaintiff saw Dr. Griffin for a follow-up regarding his hypertension and diabetes. Dr. Griffin wrote that he provided plaintiff with a "new dose

-13-

on HTCZ [Hydrochlorothiazide][17] and added a new prescription of Lisinopril[18] 5mg[.]"
(Tr. 307-308). On June 21, 2010, plaintiff saw Dr. Griffin for pain in his right leg. Dr.
Griffin wrote that plaintiff sustained a 2% injury in his right leg after being hit with a
baseball. Dr. Griffin noted that edema was no longer present. (Tr. 305-306). On July
27, 2010, plaintiff took a drug test which came back negative. (Tr. 287).

Dr. Wu completed a second medical source statement in July 2010. Dr. Wu
indicated that plaintiff had moderate limitations in these areas: behaving in an
emotionally stable manner; adhering to basic standards of neatness and cleanliness;
relating to family, peers, or caregivers; accepting instructions or responding to
criticism; maintaining attention and concentration for extended periods; performing at
a consistent pace without an unreasonable number and length of breaks; sustaining
an ordinary routine without special supervision; and responding to changes in work
setting. Dr. Wu found that plaintiff had marked limitations in coping with normal stress
and maintaining reliability. Dr. Wu found that plaintiff had no limitations in functioning
independently; interacting with strangers or the general public; asking simple
questions or requesting assistance; maintaining socially acceptable behavior; and
making simple and rational decisions. Dr. Wu indicated that plaintiff could apply
common-sense understanding to carry out simple one- or two-step instructions and
interact appropriately with co-workers and supervisors for 4 hours out of an 8-hour
workday and with the general public for 6 hours out of an 8-hour workday. Dr. Wu

---

[17] Hydrochlorothiazide is a diuretic used to treat high blood pressure. See
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html (last visited on
Julyy 24, 2013).

[18] Lisinopril is indicated for the treatment of hypertension. See Phys. Desk Ref.
2053 (61st ed. 2007).

believed that plaintiff would be absent and late three times a month or more. Dr. Wu

wrote that plaintiff's disability began in December 2004, which is five years earlier than

the onset date she reported in her first medical source statement. (Tr. 325-328).

### III.  The ALJ's Decision

In the decision issued on March 18, 2011, the ALJ made the following findings:

1.  Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2013.

2.  Plaintiff has not engaged in substantial gainful activity since August 31, 2009, the amended alleged onset date.

3.  Plaintiff has the following severe impairments: polysubstance abuse, bipolar disorder, hypertension, and diabetes mellitus.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Plaintiff has the residual functional capacity (RFC) to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except for lifting more than 50 pounds occasionally and 25 pounds frequently; standing or walking more than 6 hours in an 8-hour workday with normal work breaks; exposure to hazards; and performing more than simple work with no more than occasional interaction with the general public.

6.  Plaintiff is unable to perform any past relevant work.

7.  Plaintiff is 43 years old, born on April 5, 1967, which is defined as a younger individual age 18-49.

8.  Plaintiff has a high school equivalent education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is "not disabled," whether or not plaintiff has transferable job skills.

10. Considering plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11.     Plaintiff has not been under a disability, as defined in the Social Security Act, from August 31, 2009, through the date of this decision.

(Tr. 15-24).

## IV. Legal Standard

The district court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of

disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff contends that the ALJ erred by (1) failing to perform an adequate evaluation of the medical opinion of treating psychiatrist Dr. Wu; (2) failing to evaluate

the functional effects of plaintiff's cluster B personality disorder; (3) performing an incomplete and inaccurate evaluation of the evidence in determining the RFC; (4) failing to provide a narrative discussion for the RFC conclusion; and (5) failing to include all the limitations from plaintiff's impairments which were found to be severe. (Doc. #13).

## A. Opinion of Dr. Wu

Plaintiff contends that the ALJ did not properly evaluate Dr. Wu's opinion, provided legally insufficient reasons for discounting her opinion, and gave an inaccurate interpretation of the record.

In his decision, the ALJ acknowledged that Dr. Wu had been treating plaintiff since June 2004 for bipolar II disorder, marijuana abuse, and a history of alcohol and cocaine abuse. The ALJ noted that on August 20, 2009, Dr. Wu assigned plaintiff a GAF score of 55-60. The ALJ cited to the February 23, 2010 examination, in which plaintiff reported that he was heavily abusing marijuana.[19] Dr. Wu recommended that he discontinue the marijuana abuse. During that visit, plaintiff also reported that caring for his three children was making it difficult for him to work from home. The ALJ noted that on April 7, 2010, Dr. Wu completed a medical source statement that assigned plaintiff a GAF score of 55 and wrote that plaintiff's "impairments imposed multiple marked mental functional limitations." The ALJ also referenced treatment notes from April 20, 2010, in which Dr. Wu stated that plaintiff reported decreased marijuana use, compliance with his medication, and no side effects. (Tr. 18).

---

[19] The Court finds that Dr. Wu's progress notes, dated February 23, 2010, are illegible. However, Dr. Wu's notes from April 21, 2010 reflect the same report.

The ALJ gave "great weight" to the GAF scores, stating that "[t]he GAF opinions of the treating source are consistent with the clinical signs, symptoms, and findings contained in the record and supported by the evidence as a whole, including the claimant's daily activities." However, the ALJ gave "less weight" to Dr. Wu's medical source statement since it was a "product of a pre-printed form questionnaire" and did "not articulate an objective medical basis for the extreme limitations indicated and [was] inconsistent with the physician's own medical treatment records, GAF scores, and the conservative treatment rendered." (Tr. 21).

"In deciding whether a claimant is disabled, the ALJ considers medical opinions along with the rest of the relevant evidence" in the record. 20 C.F.R. § 404.1527(b). The opinion of a treating source should be given controlling weight where it is well-supported by clinical and laboratory diagnostic techniques and is not inconsistent with the record as a whole. 20 C.F.R. § 404.1527(c)(2). If an ALJ discredits a portion of a treating physician's opinion, the ALJ must give good reasons for doing so. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

As to the medical source statement, the ALJ can properly give less than controlling weight to Dr. Wu's opinion because it was conclusory. The assessment consisted solely of checklists with no references to medical evidence or explanation of her opinion that plaintiff was subject to particular limitations. "The checklist format, generality, and incompleteness of the assessments limit evidentiary value." Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001). "A treating physician's opinion deserves no greater respect . . . when [it] consists of nothing more than vague, conclusory statements." Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996).

Furthermore, the ALJ noted that the limitations endorsed by Dr. Wu were inconsistent with her own progress notes, GAF scores, and conservative treatment. These are legally sufficient reasons for discounting a treating psychiatrist's opinion. See Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."); Palmer v. Astrue, Case No. 4:07-cv-1283 (E.D. Mo. Dec. 3, 2008) (if a GAF score and a medical source statement contradict each other, the ALJ can give less weight to the source statement); Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (conservative treatment of a patient can qualify as substantial evidence to support an ALJ's decision against a disability).

In the instant case, Dr. Wu assessed plaintiff's GAF as 55, which is indicative of moderate symptoms and is inconsistent with the marked to moderate limitations she indicated in in the medical source statement. Furthermore, on August 20, 2009, Dr. Wu wrote that plaintiff "experienced a period of improvement this year after episodes of depression." Dr. Wu recommended conservative treatment (described as "low intensity community based services"), which included medication; psycho-education; physical health services to follow up with hypertension, high cholesterol and sleep apnea; case management services to assist with treatment compliance; and exercise with a healthy lifestyle. On September 7, 2009, Dr. Wu wrote that plaintiff *could not* find work--not that he *should not* work. Treatment notes from February 23, 2010 reflect sleeping issues and a poor relationship with wife and in-laws. On April 21, 2010, Dr. Wu noted that plaintiff's difficulty in maintaining employment was the result of taking on full time responsibilities in raising his children. There is no evidence in the record that plaintiff was hospitalized for bipolar disorder, that Dr. Wu suggested in-

patient treatment, or that the disorder was not controlled with medication. Therefore, the ALJ's conclusion that Dr. Wu's medical notes are inconsistent with the limitations in the medical source statement is well-supported by the record.

The fact that the ALJ cited to only 3 out of the 11 visits plaintiff had with Dr. Wu is not reversible error. An ALJ does not need to address every appointment or detail of the treating physician's notes. The record as a whole supports the ALJ's decision to decline to give the medical source statement controlling weight. Barnes v. Astrue, 4:10-CV-1322 (E.D. Mo. July 7, 2011); see also Karlix v. Barnhart, F.3d 742, 746 (8th Cir. 2006) ("The fact that the ALJ did not elaborate on this conclusion does not require reversal, because the record supports the overall conclusion.").

## B. Cluster B Personality Disorder

Plaintiff contends that the ALJ failed to evaluate the functional effects of his cluster B personality disorder. However, plaintiff did not cite cluster B personality disorder as an impairment when applying for Social Security benefits or when completing the accompanying forms. See Kirby v. Astrue, 500 F.3d 705, 708-709 (affirming ALJ's finding that claimant did not suffer significant impairment; initial disability form did not claim such impairment). Accordingly, the ALJ had no obligation to consider this disorder in his opinion.

## C. RFC Determination

Plaintiff contends that the ALJ performed an incomplete and inaccurate evaluation of the evidence in determining RFC, that the ALJ failed to provide a narrative discussion explaining how he reached his RFC conclusions, and that the RFC assessment is not supported by any medical evidence.

-22-

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)); McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (ALJ should assess the entire record, including medical reports and the individual's own description of his limitations).

The ALJ found that plaintiff had the residual functional capacity to perform medium work except for lifting more than 50 pounds occasionally and 25 pounds frequently; standing or walking more than 6 hours in an 8-hour workday with normal work breaks; exposure to hazards; and performing more than simple work with no more than occasional interaction with the general public. (Tr. 19).

As discussed above, the ALJ properly considered and weighed the medical opinion of Dr. Wu. The ALJ's failure to cite specific evidence, such as a doctor visit or specific statements made in the medical records, does not indicate that such evidence was not considered. See Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Wheeler v. Apfel, 224 F.3d 891, 896 (8th Cir. 2000).

Plaintiff further argues that because the ALJ rejected Dr. Wu's opinion there is no other medical evidence to support the ALJ's RFC finding. The Court disagrees. The

ALJ did not entirely discount Dr. Wu's medical opinion. The ALJ afforded great weight to the GAF scores, considered Dr. Wu's medical notes, and accordingly limited plaintiff's employment abilities to "simple work."

However, plaintiff is correct in his contention that the record is void of a specific opinion by a medical source as to plaintiff's physical functional abilities. This lack of information is partially due to plaintiff's failure to appear for his consultive examination scheduled on July 8, 2009. (Tr. 271-282). The Eighth Circuit has held that "the claimant's failure to provide medical evidence with this information should not be held against the ALJ when there is medical evidence that supports the ALJ's decision." Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008). Here, the ALJ wrote in his RFC assessment that "[p]hysial examinations have been essentially unremarkable and reveal normal independent gait with no evidence of spine or joint abnormality or range of motion limitation [or] muscle tenderness[.]" (Tr. 21). This statement is supported by medical records from South County Health Center. (Tr. 309-319). Therefore, the fact that a doctor does not specify how much a claimant can carry or how long he can stand or sit does not make it impossible for the ALJ to ascertain the claimant's work-related limitations. See Heavin v. Astrue, No. 4:10-cv-573 (E.D. Mo. Sept. 30, 2011).

Furthermore, in determining plaintiff's RFC, the ALJ properly addressed plaintiff's credibility, which the ALJ found to be unreliable. (Tr. 20). He noted, for example, that plaintiff's daily activities were not consistent with the degree of impairment alleged. Specifically, plaintiff plays a major role in caring for his three children, drives an automobile, plays baseball, and has the ability to perform all household chores. The ALJ correctly noted that any restrictions in plaintiff's daily activities are mainly a matter of choice, rather than any apparent medical proscription.

The ALJ also noted discrepancies between the plaintiff's hearing testimony and his medical treatment records. For instance, plaintiff testified that he has an 11th grade education, but records show he earned a GED. (Tr. 34, 309). Also, plaintiff testified that he had not abused marijuana in 2010, but medical records show otherwise. (Tr. 45-46, 291). Likewise, plaintiff testified that he last worked in August 2009, but records show that he was working in a full-time electrical position in March 2010. (Tr. 34, 317).

In further support of the ALJ's credibility analysis, the Court notes that plaintiff reported to Dr. Wu on April 21, 2010, that he was unable to pursue computer job opportunities or home employment opportunities because he had taken on full-time care of his children. (Tr. 291-292). See Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) ("Courts have found it relevant to credibility when a claimant leaves work for reasons other than [for] medical condition."). Furthermore, on September 7, 2009, a week after his alleged onset date, plaintiff reported to Dr. Wu that he could not find any work, thus indicating that he had been searching for employment. (Tr. 266). See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (seeking work while applying for disability is inconsistent with allegations of disabling condition). The ALJ also considered plaintiff's medications, mental health treatment, demeanor during the hearing and his good work history, as well as the effect of obesity. The Court finds that the ALJ's RFC determination is supported by substantial evidence.

### D. Combination of Impairments

Plaintiff contends that the ALJ failed to include in the RFC finding all the limitations from plaintiff's impairments which were found severe by the ALJ.

Specifically, plaintiff argues that the ALJ failed to include in the analysis his limited ability to concentrate.

In assessing plaintiff's RFC, the ALJ determined that he was limited to performing "no more than *simple work* with no more than occasional interaction with the general public." (Tr. 19) (emphasis added). This in itself is a significant limitation reflecting that the ALJ did consider plaintiff's bipolar disorder symptoms, which include difficulties with maintaining concentration.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in the brief in support of his complaint [Doc. #13] is **denied**.

**IT IS FURTHER ORDERED** that plaintiff's motion for extension of time to file a brief in support of the complaint [Doc. #12] is **moot**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 24th day of July, 2013.